# LINE OF CREDIT AND TERM LOAN AGREEMENT

between

**FROST CONTROLS, INC.,**
**as Borrower,**

**and**

**STATE STREET BANK AND TRUST COMPANY,**
**as Lender**

**Dated as of November 30, 1995**

**TABLE OF CONTENTS**


I. DEFINITIONS ..... 1

II. GENERAL TERMS ..... 1

2.01. Loans ..... 1
2.02. Payments of Principal and Interest on the Loans ..... 2
2.03 Prepayment Permitted ..... 2
2.04 Advances Under the Demand Line of Credit Loan ..... 3
2.05 Use of Proceeds ..... 3
2.06 Security ..... 3

III. REPRESENTATIONS AND WARRANTIES ..... 3

IV. CONDITIONS PRECEDENT ..... 3

V. AFFIRMATIVE COVENANTS ..... 4

5.01 Preservation of Assets; Compliance with Law ..... 4
5.02 Taxes, Etc. ..... 4
5.03 Notice of Proceedings or Adverse Change ..... 4
5.04 Financial Reporting ..... 4
5.05 Visitation and Inspection Rights ..... 5
5.06 Notice of Default or Event of Default ..... 5
5.07 Accounting System ..... 5
5.08 Financial Covenants ..... 5
5.09 Insurance ..... 5
5.10 Conduct of Business ..... 6
5.11 Closing Fees ..... 6
5.12 Reimbursement of Expenses ..... 6

VI. NEGATIVE COVENANTS ..... 6

6.01 Indebtedness ..... 6
6.02 Liens ..... 6
6.03 Guarantees ..... 7
6.04 Disposition of Assets ..... 7
6.05 Sale and Leasebacks ..... 7
6.06 Investments ..... 7
6.07 Fundamental Changes ..... 7
6.08 Dividends, Etc. ..... 7
6.09 Transactions with affiliates ..... 7
6.10 ERISA ..... 7

VII. DEMAND/DEFAULTS/RIGHTS AND REMEDIES OF LENDER UPON DEMAND OR DEFAULT ..... 8

7.01 DEMAND ..... 8
7.02 Events of Default ..... 8
7.03 Rate after Demand or Event of Default; Late Charge ..... 10

VIII. MISCELLANEOUS ........ 10

8.01 Increased Costs - Capital ........ 10
8.02 Survival ........ 10
8.03 Indemnification ........ 10
8.04 Governing Law ........ 11
8.05 Amendments, Etc. ........ 11
8.06 Notices ........ 11
8.07 Successors and Assigns ........ 12
8.08 Consent to Jurisdiction ........ 12
8.09 Waiver of Jury Trial ........ 12
8.10 Set-off, Etc. ........ 13
8.11 Severability ........ 13

**SCHEDULES**

Schedule A Definitions
Schedule B Representations and Warranties

# LINE OF CREDIT AND TERM LOAN AGREEMENT

THIS LINE OF CREDIT AND TERM LOAN AGREEMENT (as the same may be amended from time to time, the "Agreement") is made as of the 30th day of November, 1995, between **FROST CONTROLS, INC.**, a Rhode Island corporation with its principal office at 7 Industrial Drive South, Smithfield, RI 02917-1526 ("Borrower"), and **STATE STREET BANK AND TRUST COMPANY**, with its principal office at 225 Franklin Street, Boston, MA 02110 ("Lender").

## WITNESSETH THAT:

Borrower has requested that Lender provide Borrower with the following credit facilities: (i) a secured export line of credit loan in an aggregate principal amount not to exceed $500,000 at any time outstanding, and (ii) a secured term loan in an aggregate principal amount not to exceed $750,000 (collectively, the "Loans") and Lender has agreed to extend such Loans upon the terms and subject to the conditions hereinafter set forth. Capitalized terms used herein are defined in Article I of this Agreement.

## ARTICLE I

## DEFINITIONS

As used herein, the terms set forth on Schedule A hereto shall have the meanings indicated thereon.

## ARTICLE II

## GENERAL TERMS

**Section 2.01. Loans.** (a) **Term Loan.** Subject to the terms of this Agreement, Lender agrees to make a term loan (the "Term Loan") to Borrower in the aggregate principal amount of $750,000. Subject to the terms and conditions in Article IV, Lender agrees to advance the Term Loan as follows: $350,000 shall be advanced on the date hereof; $100,000 shall be advanced following receipt by Borrower of export certification from the Recognized Organization, provided such certification is received on or before nine months from the date hereof; and $300,000 shall be advanced upon Lender's satisfaction in its reasonable discretion that Borrower has demonstrated quantifiable Export Marketing Success. As used herein, "Export Marketing Success" shall mean the date by which Lender is satisfied in its reasonable discretion that Borrower has reached $200,000 in export sales which date must occur on or before nine months from the date of Borrower's receipt of such export certification and within one year from the date hereof in order for the final $300,000 to be advanced. The Term Loan shall be evidenced by the Term Note which is hereby incorporated herein by reference and made a part hereof.

(b) **Export Line of Credit Loan.** Subject to the terms of this Agreement, Lender agrees to make loans to Borrower from time to time until the Expiration Date on a revolving demand line of credit basis (the "Export Line of Credit Loan") in an aggregate principal amount not to exceed the Export Line of Credit (as hereinafter defined). For purposes hereof, the Export Line of Credit shall be equal to the lesser of: (i) $500,000; or (ii) the sum of 80% of Eligible Accounts Receivable plus (B) 65% of Eligible Inventory. Borrower may request advances under the Export Line of Credit ("Advances") from Lender in accordance with Section 2.04 hereof. Within the Export Line of Credit, Borrower may borrow, repay (without premium or penalty), and reborrow under the provisions of this Section and Section 2.04. Each Advance shall be in an amount of at least $5,000 and each partial payment shall be at least $5,000. If at any time the outstanding principal balance of the Advances exceeds the Export Line of Credit, Borrower shall immediately pay to Lender the amount of such excess. The Advances shall be evidenced by the Export Line of Credit Note which is hereby incorporated herein by reference and made a part hereof.

Section 2.02. Payments of Principal and Interest on the Loans. (a) Unless the Default Rate shall apply, the outstanding principal balance of the Term Loan shall bear interest at a rate per annum equal to the WSJ Prime Rate plus 1.50%, with each change in said rate to be monthly as set forth in the Term Note. Interest will be computed in arrears on the amounts advanced based on a 360 day year counting the actual number of days elapsed. Principal on the Term Loan shall be due and payable monthly on the first Business Day of each month beginning July 1, 1996 through November 1, 2002 in 77 equal installments of $9,616.00, with a final 78th installment due on December 1, 2002 of all then outstanding principal on the Term Loan. Accrued and unpaid interest on the Term Loan shall be due and payable on demand during the first six months from the date hereof and on the first Business Day of each month after the date hereof with each principal installment and at maturity (whether on the due date, by acceleration, demand or otherwise).

(b) Unless the Default Rate shall apply, the outstanding principal balance of the Export Line of Credit Loan shall bear interest at a rate per annum equal to 1.50% above the Prime Rate, with each change in said rate to be effective simultaneously on the effective date of each change in the Prime Rate without notice to Borrower. Interest will be computed in arrears and based on a 360 day year counting the actual number of days elapsed. Interest on the outstanding principal balance of the Export Line of Credit Loan will be paid monthly commencing on the first Business Day after the date hereof and continuing on the first Business Day of each successive month until the principal balance of the Export Line of Credit Loan is paid in full. A final payment of all principal and accrued interest on the Export Line of Credit Loan will be made by Borrower to Lender on the earlier of DEMAND or the Expiration Date. Accrued and unpaid interest on the Export Line of Credit Loan shall be due and payable on the first Business Day of each month and at maturity (whether by demand or acceleration, on the Expiration Date or otherwise).

(c) All payments to be made by Borrower of principal of, and interest on, the Notes and all Fees and Expenses payable by Borrower hereunder, may be made by Lender, at its option, debiting any demand deposit account(s) of Borrower maintained with Lender, or in such other reasonable manner as may be designated by Lender in writing to Borrower, and in any event all such payments shall be made to Lender in U.S. dollars in immediately available funds prior to 12:00 o'clock Noon (Boston, MA time) on or before the day that such payment is due. Any payments coming due on a day other than a Business Day will be due on the next Business Day and such additional time will be taken into account in computing interest thereon. Borrower hereby authorizes Lender to charge or debit at any time and from time to time any demand deposit account maintained by Borrower with Lender in order to pay sums properly payable hereunder and Lender shall be entitled to rely upon this authorization.

Section 2.03. Prepayment Permitted. Borrower may prepay without premium or penalty the principal of the Term Note, in whole at any time, or in part from time to time, upon not less than five Business Days' prior notice to Lender, and provided in the case of a partial payment, that such payment is in an amount of not less than $10,000 Each prepayment shall be accompanied by the interest accrued on the principal amount so prepaid through the date of prepayment.

Section 2.04. Advances Under the Export Line of Credit Loan. Borrower will open and maintain with Lender an account which will be the principal depository of Borrower's funds. Advances under the Export Line of Credit Loan will be made by Lender to Borrower upon telephonic or written request to credit such Advance to Borrower's account made by an officer of Borrower who has been duly authorized by its board of directors and whose name, along with a certified copy of such resolutions, has been transmitted to Lender.

Section 2.05. Use of Proceeds. The proceeds of the Term Loan shall be used by Borrower to provide long term working capital associated with the export marketing and sales of light curtains. The

proceeds of the Advances shall be used exclusively by Borrower for short term working capital needs of Borrower. Borrower shall not be obligated in any event to borrow all of the proceeds of the Loans.

**Section 2.06.** Security. Payment and performance of the Obligations and any other indebtedness and liabilities of Borrower to Lender, whether under the Notes or otherwise, shall be secured by: (a) a first priority security interest in the Collateral pursuant to the terms of the Security Agreement, (b) the Guarantees, (c) collateral assignments of life insurance, insuring each Guarantor for an amount not less than $750,000, (d) a negative pledge on the personal residences of the Guarantors, (e) a subordination agreement of affiliates of Borrower in favor of Lender with respect to Indebtedness of Borrower to affiliates, and (f) such other security documents as may be required by Lender. All agreements and instruments described in this Section 2.06, together with any and all other agreements and instruments now or hereafter securing the Notes, are sometimes hereinafter referred to collectively as the "Security Documents" and individually as a "Security Document".

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loans, Borrower hereby represents and warrants to Lender (which representations and warranties shall survive the delivery of the Notes and the making of the Loans) the representations and warranties set forth in Schedule B hereto.

## ARTICLE IV

## CONDITIONS PRECEDENT

The obligation of Lender to make each advance on the Term Loan and to make each Advance under the Export Line of Credit Loan is subject to the satisfaction of the conditions set forth in Section 2.01 and the following conditions precedent: (a) the representations and warranties set forth in Article III hereof and in all other Loan Documents shall be true and correct, (b) Borrower shall have executed and delivered to Lender, or caused to be executed and delivered to Lender, on or prior to the date of execution of this Agreement, each of the documents, opinions and certificates required by Lender, each in scope, form and substance satisfactory to Lender in its sole discretion, and all other documents reasonably necessary to consummate the lending transactions contemplated hereby, (c) all legal matters incident to the transactions hereby contemplated shall be satisfactory to counsel for Lender, (d) no demand on either of the Loans and no Default or Event of Default shall have occurred and be continuing or would result from the making of such advance on the Term Loan or any Advance, (e) with respect to the Export Line of Credit Loan, Advances shall be made only against firm written export purchase orders for Eligible Inventory, a copy of which shall have been delivered to Lender along with a completed Eximbank Export Certificate therefor, and Eligible Accounts Receivable, and (f) no Material Adverse Change, or development reasonably likely to have a Material Adverse Effect, shall have occurred and be continuing. Each Loan request shall constitute a certificate by Borrower to such effect.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until payment and satisfaction in full of all Obligations, whether now existing or arising hereafter, and until this Agreement is terminated, Borrower will:

**Section 5.01.** Preservation of Assets; Compliance with Law. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises; at all times maintain, preserve and protect all franchises, leases, patents, trademarks, service marks, copyrights, contracts and trade names and preserve all the remainder of its property used or useful in the conduct of its business and keep the same in good repair, working order and condition, and from time to time, make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and (b) comply with all applicable laws, rules, regulations and orders, whether now in effect or hereafter enacted or promulgated by any Governmental Authority, including without limitation Environmental Requirements.

**Section 5.02.** Taxes, Etc. Pay and discharge or cause to be paid and discharged, when due, all taxes, assessments and legitimate governmental charges or levies imposed upon it or upon its respective income and profits or upon any of its property, real, personal or mixed, or upon any part thereof, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a Lien upon such properties or any part thereof except for any taxes, assessments, governmental charges or levies which Borrower is contesting in good faith through appropriate proceedings and for which adequate reserves have been established.

**Section 5.03.** Notice of Proceedings or Adverse Change. Give written notice to Lender, as soon as possible and in any event within ten days after Borrower has knowledge, of (i) any proceedings or investigations being instituted or threatened to be instituted by or against Borrower in any federal or state court or before any commission or other regulatory body, whether federal, state or local which, if adversely determined, would have a Material Adverse Effect and (ii) any Material Adverse Change.

**Section 5.04.** Financial Reporting. Furnish to Lender:

(a) Within 90 days of the end of each fiscal year, reviewed Financial Statements, showing the financial condition at the close of such fiscal year, the results of operations during such year and containing a statement to the effect that its independent certified public accountants have examined the provisions of this Agreement and that no Default or Event of Default has occurred, together with any written reports delivered by such accountants to Borrower with respect to such Financial Statements and the review thereof conducted by such accountants;

(b) Within 30 days after the end of each month, internally prepared Financial Statements for such month and the fiscal year to that date, subject to changes resulting from routine year-end audit adjustments, together with a comparison to the Financial Statements for the same period in the prior year in form satisfactory to Lender;

(c) Simultaneously with the furnishing of each of the Financial Statements to be delivered pursuant to subsection (b) above, a financial covenant compliance certificate in form satisfactory to Lender, certified by the president or chief financial officer of Borrower;

(d) Within 15 days after the end of each month, a Borrowing Base Certificate of Borrower as of the end of such month in form satisfactory to Lender, and an accounts aging report and inventory

designation as of the end of such month, all certified by the president or chief financial officer of Borrower;

(e) Within the 60-day period prior to the end of each year, projected annual balance sheets and income statements for each month of the following fiscal year; and

(f) Promptly, from time to time such other information regarding the business affairs and financial condition of Borrower and Guarantors as Lender may reasonably request.

**Section 5.05.** **Visitation and Inspection Rights**. Permit agents or representatives of Lender to perform field audits and to inspect and to discuss the affairs, finances and accounts of Borrower with its officers, at any time and from time to time during normal business hours (but limited to three times per fiscal year if no Default exists hereunder) upon prior notice (unless a Default exists hereunder in which case no notice need be given), , at Borrower's expense ($500 per field audit), and to inspect (i) the Collateral, (ii) Borrower's books and records and to make abstracts or reproductions thereof and to duplicate and reduce to hard copy any and all computer or electronically stored information or data and (iii) to participate in and/or observe each physical count or audit of inventory undertaken on behalf of Borrower; Borrower shall provide Lender with a copy of the results of each physical count or audit of inventory upon receipt by Borrower.

**Section 5.06.** **Notice of Default or Event of Default**. Immediately advise Lender of the occurrence of any Default or Event of Default.

**Section 5.07.** **Accounting System**. Maintain a standard system of accounting in accordance with GAAP.

**Section 5.08.** **Financial Covenants**. Fulfill each of the following financial covenants:

(a) **Operating Cash Flow to Debt Service Ratio**. Not permit its ratio of Operating Cash Flow to Total Debt Service to be less than 1.50:1.00 for each of its fiscal quarters and each of its fiscal years ending on or after June 30, 1996.

(b) **Current Ratio**. Not permit its ratio of Current Assets to Current Liabilities at any time to be less than 1.75:1.00 (tested on the date hereof and on a quarterly and annual basis).

(c) **Debt to Worth Ratio**. Not permit its ratio of Total Liabilities to Tangible Net Worth at any time to be greater than 1.25:1.00 (tested on the date hereof and on a quarterly and annual basis).

(d) **Tangible Net Worth**. Maintain at all times from the date hereof through December 31, 1995 a Tangible Net Worth of not less than $735,000 (tested on the date hereof and on December 31, 1995). Maintain at all times during each fiscal year thereafter (tested on a quarterly basis) a Tangible Net Worth equal to the Tangible Net Worth required for the immediately preceding fiscal year plus the greater of (a) 50% of its net income for such immediately preceding fiscal year, or (b) $75,000.

(f) **Profitability**. Have a net loss of no greater than $10,000 in its fiscal year ending December 31, 1995. Earn net income in each fiscal year thereafter and in each period of two consecutive fiscal quarters ending after December 31, 1995 of at least $1.00.

**Section 5.09.** **Insurance**. Keep all of its insurable properties, now or hereafter owned, adequately insured at all times against loss or damage by fire or other casualty to the extent required by the Security Documents and otherwise to the extent customary with respect to like properties of companies conducting similar businesses; maintain public liability, business interruption and worker's

compensation insurance insuring Borrower to the extent customary with respect to companies conducting similar businesses, all by financially sound and reputable insurers and, upon request of Lender, furnish to Lender policies and certificates constituting satisfactory evidence of the same; notify Lender of any material change in the insurance maintained on Borrower's properties after the date hereof and furnish Lender satisfactory evidence of any such change. All such insurance must be in such amounts, in such forms and with such companies as are reasonably acceptable to Lender, shall name Lender as loss payee and additional insured, as applicable, and shall provide at least 30 days' cancellation notice to Lender. In the event that Borrower shall default in the performance of its Obligations under this Section, Lender, at its option, may effect such insurance coverage with an insurer acceptable to Lender and add the premium(s) paid therefor to the principal amount of the indebtedness incurred pursuant hereto, and the amount of such premium shall be payable by Borrower on demand.

**Section 5.10** **Conduct of Business**. Conduct its business in a prudent and reasonable manner and in substantially the same field as such business is now being conducted. Use Lender as the principal depository of its funds.

**Section 5.11.** **Closing Fees**. Pay to Lender the balance of the Eximbank Guaranty Fee of $7,500 and the SBA Guaranty Fee of $12,750, after applying thereto the $4,000 in fees already paid by Borrower to Lender.

**Section 5.12.** **Reimbursement of Expenses**. On the date of execution of this Agreement, reimburse Lender for all Expenses incurred by Lender on or prior to such date. From and after such date, Borrower shall promptly reimburse Lender on demand for all Expenses as the same are incurred by Lender.

## ARTICLE VI

## NEGATIVE COVENANTS

Borrower covenants and agrees that, until payment and satisfaction in full of all Obligations, whether now existing or arising hereafter, and until the termination of this Agreement, Borrower will not, directly or indirectly:

**Section 6.01.** **Indebtedness**. Incur or create any Indebtedness other than Permitted Indebtedness.

**Section 6.02.** **Liens**. Create, incur, assume or otherwise permit any Lien or judgment (whether as a result of a purchase money or title retention transaction, or security interest, or otherwise) to exist on any of its assets, properties or goods, whether real, personal or mixed, whether now owned or hereafter acquired, except for: (a) Liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which it shall have set aside on its books adequate reserves, (b) deposits under worker's compensation, unemployment insurance and social security laws, or to secure the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or to secure statutory obligations or surety or appeal bonds, or to secure indemnity, performance or other similar bonds in the ordinary course of business, (c) Liens imposed by law, such as carriers', warehousemen's or mechanics' liens, incurred by it in good faith in the ordinary course of business, and liens arising out of a judgment or award against it with respect to which it shall currently be prosecuting an appeal, a stay of execution pending such appeal having been secured, (d) Purchase Money Liens, and (e) Liens in favor of Lender.

**Section 6.03.** **Guarantees**. Guarantee, endorse or otherwise in any way become or be responsible for obligations of any other Person, except endorsements of negotiable instruments for collection in the ordinary course of business.

 

**Section 6.04.** __Disposition of Assets__. Sell, lease, transfer or otherwise dispose of its properties, assets, rights, licenses and franchises to any Person, except sales of inventory in the ordinary course of its business, or turn over the management of, or enter a management contract with respect to, such properties, assets, rights, licenses and franchises.

**Section 6.05.** __Sale and Leasebacks__. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real, personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property.

**Section 6.06.** __Investments__. Purchase, invest in or otherwise acquire or hold securities, including, without limitation, capital stock and evidences of indebtedness of, or make loans or advances to, or enter into any arrangement for the purpose of providing funds or credit to, any other Person, except: (a) advances to employees for business expenses or for personal needs not to exceed $2,000 in the case of any one employee and not to exceed $10,000 in the aggregate to all employees outstanding at one time; and (b) investments in certificates of deposit issued by Lender or in short-term obligations of the United States.

**Section 6.07.** __Fundamental Changes__. Dissolve, liquidate, merge, consolidate or otherwise alter or modify Borrower's corporate name, mailing address, principal place of business, structure, status or existence or enter into or engage in any operation or activity materially different from that presently conducted by Borrower; make any substantial change in its executive management; form any subsidiary; or amend its corporate charter, articles of incorporation or by-laws in any manner that could have a Material Adverse Effect.

**Section 6.08.** __Dividends, Etc__. Pay any dividends, or make any distribution of cash or property, or both, to holders of shares of its capital stock, or directly or indirectly, redeem, purchase or otherwise acquire for a consideration, any shares of its capital stock, of any class. Make any payments on Subordinated Indebtedness; __provided__, __however__, if no Default exists hereunder or results therefrom, Borrower may, to the extent otherwise permitted by applicable law, declare and pay dividends to its shareholders in cash in respect of each fiscal year during which Borrower's "S" election is in effect under the Internal Revenue Code in an amount not to exceed the lesser of (a) 50% of its net income for such fiscal year, or (b) the amount necessary to provide each individual shareholder with funds to pay his or her respective taxes on the taxable net income of Borrower for such fiscal year, adjusted for prior losses, which are apportioned under the Internal Revenue Code to the shareholders for purposes of income taxation.

**Section 6.09.** __Transactions with affiliates__. Enter into any transaction, including, without limitation, the purchase, sale or exchange of property or assets or the rendering or accepting of any service with or to any affiliate except in the ordinary course of business and pursuant to the reasonable requirements of Borrower's business and upon terms not less favorable to Borrower than it could obtain in a comparable arm's-length transaction with a third party other than such affiliate.

**Section 6.10.** __ERISA__. (a) Fail, or permit any Commonly Controlled Entity to fail, to comply with the requirements of ERISA or the Code with respect to any Employee Benefit Plan, including without limitation, the minimum funding standards of Section 302 of ERISA and Section 412 of the Code; (b) permit any funded Employee Pension Plan to lose its qualified status under Section 401(a) or 403(a) of the Code; (c) create or adopt, or permit any Commonly Controlled Entity to create or adopt, any new Employee Pension Plan without the prior written consent of the Lender; (d) modify, or permit any Commonly Controlled Entity to modify, any existing Employee Pension Plan so as to increase its obligations thereunder, except in the ordinary course of business consistent with past practice or with the prior written consent of the Lender; (e) create or adopt any new Employee Welfare Plan or modify any existing Employee Welfare Plan, or permit any Commonly Controlled Entity to create or adopt any new

Employee Welfare Plan or modify any existing Employee Welfare Plan, to provide continuing benefits or coverage for any participant (or beneficiary) after the termination of the participant's employment except as may be required by COBRA, regulations thereunder or applicable state statutory law or with the prior written consent of the Lender; or (f) engage, or permit any Commonly Controlled Entity to engage, in any transaction which would reasonably result in the assessment of a direct or indirect liability to Borrower or any Commonly Controlled Entity under Section 409 or 502 of ERISA or Section 4975 of the Code.

## ARTICLE VII

## DEMAND/DEFAULTS/RIGHTS AND REMEDIES OF LENDER UPON DEMAND OR DEFAULT

**Section 7.01. DEMAND.** NOTHING CONTAINED IN THIS SECTION, OR ELSEWHERE IN THIS AGREEMENT, SHALL AFFECT THE DEMAND NATURE OF THE EXPORT LINE OF CREDIT NOTE. THE OCCURRENCE OF AN EVENT OF DEFAULT SHALL NOT BE A PREREQUISITE TO THE LENDER'S MAKING DEMAND OR REQUIRING PAYMENT OF SUCH OBLIGATION.

**Section 7.02. Events of Default.** In each case of the happening of any of the following events (each of which is herein and in other Loan Documents sometimes called an "Event of Default"):

(a) failure of Borrower to pay (i) any installment of principal of, or interest on, any Note, (ii) Fees or Expenses or (iii) any other Obligations, within five days after the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or by acceleration or otherwise;

(b) failure of Borrower to perform, comply with or observe any term, covenant or agreement applicable to Borrower contained in Articles II, IV, V or VI hereof, Section 8.01 or 8.03 hereof or in any Note (other than Borrower's failure to borrow all proceeds of the Loans which shall not constitute an Event of Default);

(c) failure of Borrower to perform, comply with or observe any other term, covenant or agreement applicable to Borrower pursuant to this Agreement other than as set forth in other paragraphs of this Section 7.01, and such default shall continue unremedied for a period of 20 days after the delivery of written notice thereof by Lender to Borrower;

(d) any representation or warranty made by or on behalf of Borrower pursuant to this Agreement, any other Loan Document or any other agreement, document, instrument or certificate executed by Borrower in favor of Lender shall be untrue or misleading in any material respect as of the date such representation or warranty was made or is deemed to have been made;

(e) the occurrence of a default or event of default with respect to any Indebtedness (other than to Lender), if the effect of such default is to accelerate the maturity of such Indebtedness or to permit the holder thereof to cause such Indebtedness to become due prior to the stated maturity thereof, or if any Indebtedness of Borrower (other than to Lender) is not paid, when due and payable, whether at the due date thereof or by acceleration or otherwise;

(f) the occurrence of any "Event of Default" as defined in any Security Document;

(g) Borrower shall (i) discontinue or abandon operation of its business, (ii) apply for or consent to or suffer the appointment of a receiver, trustee, custodian or liquidator of it or any of its property, (iii) admit in writing its inability to pay its debts as they mature, (iv) make a general

assignment for the benefit of creditors, (v) file, or have filed against it, a petition for relief under Title 11 of the United States Code, (vi) file, or have filed against it, a petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or if corporate action shall be taken for the purpose of effecting any of the foregoing, (vii) become insolvent, (viii) fail to generally pay its debts as they mature or (ix) have liabilities which exceed the fair value of its assets;

(h) any judgment or court order for the payment of money in excess of an aggregate of $50,000 shall be rendered against Borrower or any of its property, and either the same shall remain undischarged or not bonded off for a period of 60 consecutive days, or execution shall have issued in respect thereof;

(i) the occurrence of any attachment of any deposits or other property of Borrower in the hands or possession of Lender, or the occurrence of any attachment of any other property of Borrower in an amount exceeding $25,000 (excluding normal customs processing in the ordinary course of business) and either the same shall remain undischarged for a period of 60 consecutive days or execution shall have issued in respect thereof;

(j) the death or judicial declaration of incompetence of either of the Guarantors;

(k) the occurrence of any event or condition described in paragraph (e), (g), (h) or (i) of this Section 7.01 with respect to either of the Guarantors or any other Person liable, in whole or in part, for payment or performance hereof or of any Note or other Obligation;

(l) for any reason, any Security Document (including, without limitation, the Guarantees) at any time shall not be in full force and effect in all material respects or shall not be enforceable in all material respects in accordance with its terms, or any Lien granted pursuant thereto shall fail to be perfected, or any Person (other than Lender) shall contest the validity, enforceability or perfection of any Lien granted pursuant thereto, or any party thereto (other than Lender) shall seek to disaffirm, terminate, limit or reduce its obligations under any Security Documents;

(m) for any reason either of the Guarantors shall terminate or seek to terminate or limit, by written or verbal notice, his Guaranty or shall be in default of his obligations to Lender;

(n) the occurrence of a change in beneficial ownership of the issued and outstanding voting stock of Borrower from that existing on the date of this Agreement; or

(o) Borrower suffers or sustains a Material Adverse Change or the prospect of repayment of Lender is materially impaired;

then, upon the occurrence of any such Event of Default which has not been cured by Borrower or waived in writing by Lender, Lender may, by notice to Borrower, declare all Obligations to be immediately due and payable. Upon Lender's declaration, the Obligations shall become immediately due and payable, both as to principal and interest, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Notes or other evidence of such Obligations to the contrary notwithstanding (except with respect to any Event of Default set forth in Section 7.01(g), in which case all Obligations shall automatically become immediately due and payable without the necessity of any notice or other demand) and any obligation of Lender to make Advances to Borrower shall immediately terminate. Lender may enforce payment of the same and exercise any or all of the rights, powers and remedies possessed by Lender, whether under this Agreement, the Security Documents or under any agreement securing the Obligations of Borrower hereunder, or afforded by

applicable law. The remedies provided for herein are cumulative and are not exclusive of any other remedies provided by law. Borrower agrees to pay Lender's attorneys' fees and legal expenses incurred in enforcing Lender's rights, powers and remedies under this Agreement, the Notes, the Security Documents and any other agreement securing the Obligations.

**Section 7.03.** **Rate after Demand or Event of Default; Late Charge**. Without regard to whether Lender has exercised any other rights or remedies hereunder, if a demand on any Loan has been made or an Event of Default shall have occurred and be continuing, the applicable interest rate under the Notes shall be increased, to the extent permitted by law, to a rate per annum equal to 3.00% above the rate or rates otherwise applicable to the Obligations. In addition, any payment of principal or interest not paid within ten days of the date the same is due and payable under the Notes shall, to the extent permitted by applicable law, be subject to a late charge of 5% of the overdue payment.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.01.** **Increased Costs - Capital**. If Lender shall have determined that the adoption of any applicable law, rule, regulation, guideline, directive or request (whether or not having force of law) regarding capital requirements, or the interpretation or administration thereof, by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any of the foregoing with respect to the Loans imposes or increases a requirement by Lender to allocate capital resources to its commitments, including its Obligations hereunder, which has or would have the effect of reducing the return on Lender's capital to a level below that which Lender could have achieved (taking into consideration Lender's then existing policies with respect to capital adequacy and assuming full utilization of Lender's capital) but for such adoption, change or compliance by any amount deemed by Lender to be material, then, in each such case: (i) Lender shall promptly after its determination of such occurrence give notice thereof to Borrower and (ii) Borrower shall pay to Lender as an additional fee from time to time on demand such amount as Lender certifies to be the amount that will compensate it for such reduction. A certificate of Lender claiming compensation under this Section shall be conclusive in the absence of manifest error. Such certificate shall set forth the nature of the occurrence giving rise to such compensation, the additional amount or amounts to be paid to it hereunder and the method by which such amounts were determined. In determining such amounts, Lender may use any reasonable averaging and attribution methods.

**Section 8.02.** **Survival**. This Agreement and all covenants, agreements, representations and warranties herein and in the certificates delivered pursuant hereto, shall survive the making by Lender of the Loans and the execution and delivery to Lender of the Notes and shall continue in full force and effect so long as the Notes and any other indebtedness of Borrower to Lender is outstanding and unpaid.

**Section 8.03.** **Indemnification**. Borrower shall and hereby agrees to indemnify, defend and hold harmless Lender and its directors, officers, agents, employees and counsel from and against any and all losses, claims, damages, liabilities, deficiencies, judgments or expenses incurred by any of them (except to the extent that it is finally judicially determined to have resulted from their own gross negligence or willful misconduct) arising out of or by reason of any litigation, investigations, claims or proceedings which arise out of or are in any way related to (i) this Agreement or the transactions contemplated hereby, (ii) any actual or proposed use by Borrower of the proceeds of the Loans, (iii) any breach by Borrower of any of the provisions of this Agreement or (iv) Lender's entering into this Agreement, the other Loan Documents or any other agreements and documents relating hereto, including, without limitation, amounts paid in settlement, court costs and fees and disbursements of counsel incurred in connection with any such litigation, investigation, claim or proceeding or any advice rendered in connection with any of the foregoing. If and to the extent that any Obligations are unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the

payment and satisfaction of such Obligations which is permissible under applicable law. Borrower's obligations set forth in this Section 8.03 shall survive any termination of this Agreement and the other Loan Documents and the payment in full of the Obligations, and are in addition to, and not in substitution of, any other of its obligations set forth in this Agreement or otherwise. In addition, Borrower shall, upon demand, pay to Lender all costs and expenses (including the reasonable fees and disbursements of counsel and other professionals) paid or incurred by Lender in (i) enforcing or defending its rights under or in respect of this Agreement, the other Loan Documents or any other document or instrument now or hereafter executed and delivered in connection herewith, (ii) collecting the Loans, (iii) foreclosing or otherwise collecting upon the Collateral or any part thereof and (iv) obtaining any legal, accounting or other advice in connection with any of the foregoing.

**Section 8.04**. Governing Law. THIS AGREEMENT, THE NOTES AND THE ADMINISTRATION THEREOF SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE COMMONWEALTH OF MASSACHUSETTS. It is intended that this Agreement shall take effect as a sealed instrument.

**Section 8.05**. Amendments, Etc. No amendment or waiver of any provision of this Agreement, or of the Notes, or of any of the Security Documents, nor consent to any departure by Borrower from a provision, shall be effective unless the same shall be in writing and signed by Lender. A written amendment, consent or waiver shall be effective only in the specific instance, and for the purpose, for which given. No notice to, or demand, on Borrower, in any one case, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 8.06**. Notices. All notices and correspondence hereunder shall be in writing and sent by certified or registered mail, return receipt requested, or by overnight delivery service, with all charges prepaid, to the applicable party at the addresses set forth below, or by facsimile transmission (including, without limitation, computer generated facsimile), promptly confirmed in writing sent by first class mail, to the FAX numbers and addresses set forth below.

If to Borrower:

Frost Controls, Inc.
7 Industrial Drive South
Smithfield, RI 02917-1526
Attention: Robert J. Thomson, President
FAX No.: (401) 231-1530

With a copy to:

Keith H. Fine, Esq.
Licht & Semonoff
One Park Row
Providence, RI 02903
FAX No.: (401) 272-9408

If to Lender:

State Street Bank and Trust Company
225 Franklin Street
Boston, MA 02110
Attention: Deborah M. Aiken, Vice President
FAX No.: (617) 654-3991

With a copy to:

Susan E. Siebert, Esq.
Edwards & Angell
101 Federal Street
Boston, MA 02110
FAX No.: (617) 439-4170

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section. All such notices and correspondence shall be deemed given upon the earliest to occur of (i) actual receipt, (ii) if sent by certified or registered mail, three Business Days after being postmarked, (iii) if sent by overnight delivery service, when received at the above stated addresses or when delivery is refused or (iv) if sent by facsimile transmission, when receipt of such transmission is acknowledged.

**Section 8.07.** **Successors and Assigns; Waivers**. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower shall not have the right to assign this Agreement or any interest herein without the prior written consent of Lender. Neither any failure nor any delay on the part of Lender in exercising any right, power or privilege hereunder, or under the Notes, or any Security Document shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or future exercise, or the exercise of any other right, power or privilege.

**Section 8.08.** **Consent to Jurisdiction**. Borrower hereby submits to the jurisdiction of the courts of the Commonwealth of Massachusetts and the State of Rhode Island and the United States District Courts for the District of Massachusetts and the District of Rhode Island, as well as to the jurisdiction of all courts from which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of any of Borrower's Obligations under or with respect to this Agreement, the Notes, the Security Documents or any of the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.

**Section 8.09.** **Waiver of Jury Trial**. BORROWER AND LENDER EACH HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE NOTES, THE SECURITY DOCUMENTS OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THE ADMINISTRATION THEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this Agreement, including but not limited to any assignee of or successor to Borrower or Lender, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this Agreement, the Notes, the Security Documents or any related instruments or the relationship between the parties. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY

DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

**Section 8.10.** Set-off, Etc. Borrower agrees that, in addition to (and without limitation of) any right of set-off, banker's lien or counterclaim Lender may otherwise have, Lender shall be entitled at its option and whether or not fully secured, to offset balances held by it for the account of Borrower at any of its offices, against any indebtedness or other fees or charges owed to Lender hereunder if the same are not paid when due (regardless of whether such balances are then due to Borrower) or if Borrower becomes insolvent, howsoever evidenced, or if any Event of Default occurs, and that such offset balances may be applied toward the payment of any indebtedness of Borrower to Lender, whether or not such indebtedness or any part thereof shall then be due and whether or not such indebtedness is otherwise fully secured.

**Section 8.11.** Severability, Etc. In case any provision in or obligation under this Agreement or the Notes or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. The Article and Section headings in this Agreement are inserted for convenience of reference only and shall not in any way affect the meaning or construction of any provision of this Agreement. This Agreement supersedes Borrower's application for credit, commitment letters and proposal letters in respect hereof, and all other prior dealings between the parties hereto and their respective agents, employees or officers with respect to the credit facilities extended hereby, and this Agreement, together with the other Loan Documents and the Notes, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof. This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed under seal by their duly authorized officers, all as of the day and year first above written.

Lender:

**STATE STREET BANK AND TRUST COMPANY**

By: [signature]
Title: Vice President

Borrower:

**FROST CONTROLS, INC.**

By: [signature]
Title: PRES.

## SCHEDULE A

Definitions

"Advance" or "Advances" shall mean the individual or aggregate principal amount of the Export Line of Credit Loan advanced by Lender to Borrower pursuant to Section 2.01(b) of this Agreement.

"Borrower" shall have the meaning given to such term in the preamble.

"Borrower Agreement" shall mean the Borrower Agreement of even date between Borrower and Lender relating to the Export Line of Credit Loan.

"Borrower Guarantees" shall mean, as applied to Borrower, all guarantees, endorsements or other contingent or surety obligations with respect to obligations of others whether or not reflected on the balance sheet of Borrower, including any obligation to furnish funds, directly or indirectly (whether by virtue of partnership arrangements, by agreement to keep-well or otherwise), through the purchase of goods, supplies or services, or by way of stock purchase, capital contribution, advance or loan, or to enter into a contract for any of the foregoing, for the purpose of payment of obligations of any other Person.

"Borrower Agreement" shall mean the Eximbank form Borrower Agreement of even date between Borrower and Lender relating to the Export Line of Credit Loan.

"Business Day" shall mean any day other than a Saturday, Sunday or other day when commercial banks are authorized or required to be closed in Massachusetts.

"Capital Expenditures" shall mean the expenditure of funds for, or the purchase, contracting for the purchase, or the lease of, capital improvements, fixed assets or intangible assets.

"Collateral" shall mean any and all assets, rights and interests in or to property of Borrower pledged or mortgaged to Lender, or in which a security interest is granted to Lender, from time to time, as security pursuant to the Security Documents, whether now owned or hereafter acquired.

"Current Assets" shall mean, at any date as of which the amount thereof shall be determined, all amounts that should, in accordance with GAAP, be included as current assets on the balance sheet of Borrower as at such date, less prepaid expenses and amounts due from officers, employees and affiliates.

"Current Liabilities" shall mean, at any date as of which the amount thereof shall be determined, all amounts that should, in accordance with GAAP, be included as current liabilities on the balance sheet of Borrower as at such date, plus, to the extent not already included therein, all Indebtedness that is payable upon demand or within one (1) year from the date of determination thereof unless such Indebtedness is renewable or extendable at the option of Borrower to a date more than one (1) year from the date of determination.

"Default" shall mean an Event of Default or an event, condition or default which with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" shall have the meaning given to such term in Section 7.03 of this Agreement.

"Eligible Accounts Receivable" shall mean the aggregate face amount (less the aggregate amount of all returns, discounts, claims, credits, charges and allowances of any nature and all reserves) of such of Borrower's export-related trade accounts receivable due and payable in U.S. dollars for Items sold by Borrower in the ordinary course of its export business, due and collectible in the United States, on terms usual to the business of Borrower, which satisfy at all times each of the following requirements:

(i) the cost to Borrower of the part of the Items which is not U.S. Content (as defined in this Schedule A) is not greater than 50% of the entire cost to Borrower of such Items and such part which is not U.S. Content was incorporated into the Items in the United States.

(ii) it resulted from the sale of inventory which constitutes Eligible Inventory;

(iii) if the account debtor thereon is located in a country in which Eximbank insurance coverage is not available for commercial reasons as designated in Eximbank's Country Limitation Schedule, the account in question is fully covered by a Letter of Credit from such account debtor with respect thereto, confirmed by a domestic bank acceptable to Eximbank and Lender;

(iv) if the account debtor thereon is located in a country in which Eximbank insurance coverage is available, the account in question is fully insured by Eximbank credit insurance or fully covered by a Letter of Credit from such account debtor with respect thereto, confirmed by a domestic bank acceptable to Eximbank and Lender;

(v) if said account is covered by a Letter of Credit, the Items covered thereby must have been shipped;

(vi) it is not due from a military buyer;

(vii) the Items have been shipped or delivered to (and accepted by) an account debtor located in a country in which Eximbank is not legally prohibited from doing business (as indicated in Eximbank's Country Limitation Schedule) on an absolute final sale basis and not on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return agreement, or on an open account basis, or on a "bill and hold" or a delayed billing basis and no part of the Items have been returned, rejected, lost or damaged; the account is not evidenced by chattel paper or an instrument of any kind unless such chattel paper or instrument has been delivered to Lender and endorsed or assigned to Lender's order; and said account debtor is not insolvent or the subject of any bankruptcy or insolvency proceeding of any kind;

(viii) it is a valid, legally enforceable obligation of the account debtor thereunder and is not subject to any offset (other than discount for prompt payment), dispute, claim of reduction, counterclaim, credit, allowance, reserve or other defense of any nature on the part of such account debtor or to any claim on the part of such account debtor denying liability thereunder;

(ix) it is subject to no Lien whatsoever, except for the security interest of Lender under the Security Documents;

(x) it is due and payable within 90 days after the original invoice date and it has not remained unpaid for a period exceeding 60 days from the original due date;

(xi) it does not arise out of a transaction with an affiliate;

(xii) it is otherwise includable in the Borrowing Base as described in the Borrower Agreement and it is not otherwise determined by Lender or Eximbank in their reasonable discretion, to be difficult to collect or uncollectible for any reason.

"**Eligible Inventory**" shall mean the aggregate of the lower of cost or Market Value of all of the export-related inventory of Borrower consisting of raw materials, work in process and finished goods purchased or manufactured by Borrower for resale (i) which is owned solely by Borrower and with respect to which Borrower has good, valid and marketable title; (ii) which is stored at the chief executive office or any other place of business owned or leased by the Borrower in the United States and with

respect to which Lender has perfected its Lien; (iii) which is subject to a valid, enforceable, first priority Lien in favor of Lender; (iv) which is not demonstration inventory, inventory to be sold on consignment, proprietary inventory, or inventory which is damaged, obsolete, returned, defective, recalled or unfit for further processing; (v) which is not defense articles or services or to be used in the construction, alteration, operation or maintenance of nuclear power, enrichment, reprocessing, research or heavy water production facilities; (vi) which has not been previously exported from the United States; (vii) which is to be incorporated into Items destined for shipment to a country in which Eximbank is legally prohibited from doing business as designated in Eximbank's County Limitation Schedule; (viii) which is incorporated into Items destined for shipment to a country in which Eximbank coverage is not available for commercial reasons as designated in Eximbank's Country Limitation Schedule, unless and only to the extent that such Items are to be sold to such country pursuant to terms of a Letter of Credit confirmed by a domestic bank acceptable to Eximbank and Lender; (ix) which is incorporated into Items whose sale would result in an Eligible Account Receivable; and (x) which otherwise conforms to the warranties contained herein, which is includable in the Borrowing Base as described in the Borrower Agreement and which at all times continues to be acceptable to Lender and Eximbank in their reasonable discretion.

"**Environmental Requirement(s)**" shall mean any present or future law, statute, ordinance, rule, regulation, order, code, license, permit, decree, judgment or directive of or by any Governmental Authority and relating to or addressing the protection of human health or the environment, including, without limitation, all laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, air, surface water, ground water or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes.

"**Event of Default**" shall have the meaning given to such term in Section 7.02 of this Agreement.

"**Eximbank**" shall mean the Export-Import Bank of the United States.

"**Expenses**" shall mean all present and future expenses incurred by or on behalf of Lender in connection with this Agreement or any of the other Loan Documents, whether incurred heretofore or hereafter, which expenses shall include, without being limited to, the cost of record searches, attorneys' fees, disbursements and expenses, all costs and expenses incurred by Lender in opening bank accounts, depositing checks, receiving and transferring funds, and any charges due to "insufficient funds" of deposited checks and Lender's standard fee relating thereto, the fees payable to the collateral examination staff of Lender, fees and expenses of accountants, appraisers or other experts or advisors retained by Lender, fees and taxes relative to the filing of financing statements, costs of preparing and recording the Security Documents and all expenses, costs and fees set forth in Articles V, VII or VIII of this Agreement.

"**Expiration Date**" shall mean one year from the date hereof.

"**Export Line of Credit**" shall have the meaning given to such term in Section 2.01(b) of this Agreement.

"**Export Line of Credit Loan**" shall have the meaning given to such term in Section 2.01(b) of this Agreement.

"**Export Line of Credit Note**" shall mean the Note of even date herewith made by Borrower in favor of Lender in the principal amount of up to $500,000 to evidence the Export Line of Credit Loan, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Fees**" shall mean the fees payable pursuant to Section 5.11 of this Agreement.

"**Financial Statements**" shall mean the balance sheet, income statement, statement of cash flows and reconciliation of net worth of Borrower for the year or other period then ended, together with supporting schedules (including a schedule of operating expenses), reviewed by independent certified public accountants approved by Lender (except that, in the case of monthly statements, such statements may be internally certified) and prepared on an accrual basis in accordance with GAAP.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as promulgated or adopted by the Financial Accounting Standards Board and in effect from time to time, consistently applied with past Financial Statements of Borrower.

"**Governmental Authority**" shall mean the United States government, any state or other political subdivision thereof, any agency, court or body of the United States government, any state or other political subdivision thereof, or any quasi-governmental agency or authority exercising executive, legislative, judicial, regulatory or administrative functions.

"**Guarantors**" shall mean Robert J. Thomson and Frederick G. Thomson.

"**Guarantees**" shall mean those certain guarantees of even date herewith of Guarantors in favor of Lender, as such Guarantees may be supplemented or amended from time to time.

"**Hazardous Material**" shall mean any material or substance (i) which, whether by its nature or use, is now or hereafter defined as a hazardous waste, hazardous substance, hazardous material, pollutant or contaminant under any Environmental Requirement, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14) and (33), the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5), and the Massachusetts Oil and Hazardous Material Chapter 21E, §2, (ii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous to human health or the environment, (iii) which is or contains petroleum or any fraction thereof, including crude oil, heating oil, gasoline or diesel fuel, or (iv) the presence of which requires investigation or remediation under any Environmental Requirement.

"**Indebtedness**" shall mean, as applied to Borrower, (i) all obligations to Lender or any other Person for borrowed money or other extensions of credit whether secured or unsecured, absolute or contingent, including, without limitation, unmatured reimbursement obligations with respect to letters of credit or guarantees issued for the account of or on behalf of Borrower and all obligations representing the deferred purchase price of property, other than accounts payable arising in the ordinary course of business, (ii) all obligations to Lender or any other Person evidenced by bonds, notes, debentures or other similar instruments, (iii) all obligations to Lender or any other Person secured by any Lien on property owned or acquired by Borrower whether or not the obligations secured thereby shall have been assumed, (iv) that portion of all obligations arising under capital leases that is required to be capitalized on the balance sheet of Borrower, (v) all Borrower Guarantees, and (vi) all obligations that are immediately due and payable out of the proceeds of or production from property now or hereafter owned or acquired by Borrower.

"**Items**" shall mean furnished goods or services which are intended for export, as specified in Section 4(A) of the Eximbank Loan Authorization Agreement related to this Agreement.

"**Lender**" shall have the meaning given to such term in the preamble of this Agreement.

"**Letter of Credit**" shall mean an irrevocable letter of credit subject to UCP 500, payable in the United States or at the issuing bank and issued for the benefit of Borrower on behalf of an account debtor

in connection with the purchase of Items, payable in the full amount of the face value of the account receivable for such Items in U.S. Dollars.

"Lien(s)" shall mean any lien, claim, charge, pledge, security interest, mortgage, deed of trust or other encumbrance.

"Loan Documents" shall mean this Agreement, the Notes, the Borrower Agreement, the SBA Loan Authorization and Agreement relating to the Term Loan, the Security Documents and all other documents or instruments executed and delivered by or on behalf of Borrower in connection with the Loans and the transactions contemplated hereby, as the same may hereafter be amended, supplemented, restated or otherwise modified from time to time.

"Loans" shall have the meaning given to such term in the preamble to this Agreement.

"Market Value" shall mean the aggregate price at which Eligible Inventory is offered for sale to customers of Borrower, as reflected on a perpetual inventory thereof, as determined by Lender and as such perpetual inventory is reduced by sales, markdowns, obsolescence and shrinkage.

"Material Adverse Change" shall mean a material adverse change in (i) the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Borrower or (ii) the Collateral, in each case as determined by Lender in its sole discretion.

"Material Adverse Effect" shall mean (i) a Material Adverse Change, (ii) a material adverse effect on Borrower's ability to perform its obligations under this Agreement or any of the other Loan Documents to which it is a party or (iii) a material adverse effect on the rights and remedies of Lender under any of the Loan Documents, in each case as determined by Lender in its sole discretion.

"Notes" shall mean the Export Line of Credit Note and the Term Note.

"Obligations" shall mean the Export Line of Credit, the Term Loan and any other loans and advances or extensions of credit made or to be made by Lender to Borrower, together with interest thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding) and, including, without limitation, any reimbursement obligation or indemnity of Borrower on account of letters of credit, and any and all indebtedness, liabilities and obligations which may at any time be owing by Borrower to Lender, whether now in existence or incurred by Borrower from time to time hereafter, whether unsecured or secured by a Lien upon any of Borrower's assets or property or the assets or property of any other Person, whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether Borrower is liable to Lender for such indebtedness as principal, surety, endorser, Guarantors or otherwise. Obligations shall also include any other indebtedness owing to Lender by Borrower under this Agreement, the Security Documents or under any other agreement or arrangement now or hereafter entered into between Borrower and Lender, Borrower's liability to Lender pursuant to this Agreement as maker or endorser of any promissory note or other instrument for the payment of money, Borrower's liability to Lender under any instrument of Guarantees or indemnity, or arising under any Guarantees, endorsement or undertaking which Lender may make or issue to others for Borrower's account, including any accommodation extended with respect to applications for letters of credit, or Lender's acceptance of drafts or endorsement of notes or other instruments for Borrower's account and benefit.

"Operating Cash Flow" shall mean, with respect to Borrower, for any relevant accounting period and determined in accordance with GAAP, (i) net income before interest accrued (whether or not paid) in respect of Indebtedness and capital leases; plus (ii) depreciation and amortization, each to the extent accrued in the relevant accounting period and actually deducted in determining net income; minus (iii) extraordinary and non-operating income.

"**Permitted Indebtedness**" shall mean (i) unsecured trade payables incurred in the ordinary course of Borrower's business; (ii) Indebtedness secured by Purchase Money Liens not to exceed $50,000 in the aggregate outstanding at any one time; (iii) Subordinated Indebtedness to its stockholder and to the U.S. Small Business Administration ("SBA"); and (iv) Indebtedness arising under this Agreement or otherwise owed to Lender.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (including any division, agency or department thereof), and, as applicable, the successors, heirs and assigns of each.

"**Prime Rate**" shall mean the rate which Lender announces in Boston from time to time as its "prime rate", as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Purchase Money Liens**" shall mean Liens in favor of the seller of, or other Person providing financing for the purchase of, any item of equipment acquired after the date of this Agreement granted or retained to secure all or a portion of the purchase price of such equipment, provided that: (i) each such Lien shall attach only to the equipment to be acquired and shall secure only the purchase money indebtedness incurred in the acquisition of such equipment; (ii) a description of the equipment so acquired is furnished to Lender; or (iii) the aggregate amount of Indebtedness outstanding at any one time incurred in connection with such acquisitions shall not exceed the lesser of (a) **[$25,000]** or (b) the amount of the purchase price of such items of equipment then being financed.

"**Security Agreement**" shall mean that certain Security Agreement of even date herewith made by Borrower in favor of Lender, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Security Documents**" shall have the meaning given to such term in Section 2.06 of this Agreement.

"**Subordinated Indebtedness**" shall mean Indebtedness of Borrower which is subordinated to Borrower's Obligations to Lender pursuant to certain subordination agreement(s) satisfactory to Lender, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Tangible Net Worth**" shall mean, at any date as of which the amount thereof shall be determined, the total assets of Borrower determined in accordance with GAAP minus (i) the sum of any amounts attributable to (a) intangible assets, including, without limitation, goodwill, unamortized debt discount and expense, patents, trademarks, service marks, tradenames, customer lists, copyrights and research and development expenses, (b) all reserves not already deducted from assets, (c) to the extent not otherwise approved in advance by Lender, any write-up in the book value of assets resulting from any revaluation thereof subsequent to the most recent reviewed Financial Statements delivered to Lender prior to the date hereof, (d) the value of minority interests in any subsidiary, (e) the value, if any, attributable to any capital stock of Borrower held in treasury or to notes or subscriptions receivable due from shareholders in respect of capital stock, (f) the net book value of leasehold improvements and (g) amounts and loans due from an affiliate minus (ii) Total Liabilities; plus the outstanding principal amount of all Subordinated Indebtedness.

"**Term Loan**" shall have the meaning given to such term in Section 2.01(a) of this Agreement.

"**Term Note**" shall mean the Note of even date herewith in the original principal amount of $750,000 made by Borrower in favor of Lender to evidence the Term Loan, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Total Debt Service**" shall mean, for any relevant accounting period and determined in accordance with GAAP, the aggregate amount of all interest expense (including, but not limited to, interest expense with respect to Indebtedness, Subordinated Indebtedness and lease obligations, whether accrued or paid) and interest paid or to be paid to vendors plus principal payments made on long-term Indebtedness and lease payments for the applicable period.

"**Total Liabilities**" shall mean, at any date as of which the amount thereof shall be determined, all obligations that should, in accordance with GAAP, be classified as liabilities on the balance sheet of Borrower, including in any event all Indebtedness as shown on the balance sheet of Borrower.

"**United States**" shall mean the United States of America and its territorial possessions.

"**U.S. Content**" shall mean with respect to any Item, all the labor, material and services which are of U.S. origin or manufacture, and which are incorporated into an Item in the United States.

"**WSJ Prime Rate**" shall mean the rate printed in the Wall Street Journal daily as the "prime rate", as in effect from time to time.

## SCHEDULE B

Representations and Warranties

1. **Financial Statements**. Borrower has furnished to Lender Borrower's Financial Statements for the fiscal year ending December 31, 1994 and the nine-month period ending September 30, 1995 which fairly present the financial condition of Borrower as of their dates, and the results of its operations for the year or other period then ended in conformity with GAAP. To the best of Borrower's knowledge and belief, Borrower does not have any contingent obligations, liabilities for taxes or unusual forward or long-term commitments except as specifically mentioned in the Financial Statements. Since the date of the Financial Statements, there has been no Material Adverse Change and since September 30, 1995, no dividends or other distributions have been declared or paid or made to the shareholders of Borrower.

2. **Organization, Etc.** Borrower (a) is duly organized, validly existing and in good standing under the laws of the state of its incorporation, (b) is duly qualified to transact business in every jurisdiction where, because of the nature of its business or property, such qualification is required, (c) has full power and authority to own its property and assets and to carry on its business as now conducted, and (d) has full power to execute, deliver and perform its obligations under the Loan Documents to which it is a party and (e) is taxed as an "S" corporation. The Borrower has no subsidiaries.

3. **Authorization, Compliance, Etc.** The execution and delivery of, and the performance by Borrower of its Obligations under, the Loan Documents (a) are within its corporate powers, (b) have been duly authorized by all requisite corporate action, (c) do not and will not violate any provision of law, any order of any court or other agency of government, or the corporate charter or by-laws of Borrower, and (d) do not and will not violate any indenture, agreement or other instrument to which Borrower is a party, or by which it is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or except as may be provided by this Agreement, result in the creation or imposition of any Lien upon any of the property or assets of Borrower pursuant to, any such indenture, agreement or instrument. Borrower is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any Governmental Authority in connection with or as a condition to the execution, delivery or performance of the Loan Documents.

4. **Litigation**. There is no action, suit or proceeding at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Borrower, threatened against or affecting Borrower.

5. **Title to Properties**. Borrower has good title to all of its properties and assets, free and clear of all mortgages, security interests, restrictions, liens and encumbrances of any kind, except Liens permitted under Section 6.02 hereof.

6. **Margin Stock, Etc**. Borrower does not own or have any present intention of acquiring, any "margin security" within the meaning of Regulation G, or any "margin stock" within the meaning of Regulation U, of the Board of Governors of the Federal Reserve System (herein called "margin security" and "margin stock"), nor does Borrower extend credit to others for the purpose of purchasing or carrying such margin stock. None of the proceeds of the Loans will be used, directly or indirectly, by Borrower for the purpose of purchasing or carrying, or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry, any margin security or margin stock or for any other purpose which might constitute the transactions contemplated hereby a "purpose credit" within the meaning of said Regulation G or Regulation U, or cause this Agreement to violate any other regulation of the Board of Governors of the Federal Reserve System or the Securities Exchange Act of 1934, as amended, or any rules or regulations promulgated under such statutes. Borrower is not an "investment

company", or a company "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

7. <u>**Filing and Payment of Taxes**</u>. Borrower has filed all federal, state and local tax returns required to be filed, and has paid, or made adequate provision for the payment of, all federal, state and local taxes, charges and assessments.

8. <u>**Compliance with Laws**</u>. Borrower (a) is in compliance with all laws, including without limitation Environmental Requirements, and has obtained and is in compliance with all permits, licenses and other authorizations which are required under all Environmental Requirements; (b) has not caused or permitted to exist any Hazardous Material on, under or about or any premises owned or leased by Borrower (collectively the "Controlled Premises") or into the atmosphere, any body of water or any wetlands in excess of maximum permitted regulatory levels or about which a Governmental Authority might require corrective action; (c) has no knowledge that the Controlled Premises have ever been used in contravention of any Environmental Requirement or as a treatment, storage or disposal site for any Hazardous Material in excess of maximum permitted regulatory levels or which is otherwise not in compliance with applicable Environmental Requirements; and (d) has not received any notice from any Governmental Authority or any other Person with respect to an alleged violation of any Environmental Requirement.

9. <u>**Patents, Trademarks, Etc.**</u> The Security Agreement sets forth (a) all federal and state registrations of trademarks, service marks and other marks, tradenames or other trade rights of Borrower, and all pending applications for additional registrations, if any, and (b) all patents and copyrights of Borrower and all pending applications for registration of any patents or copyrights, if any. Borrower is the owner of each of such rights, if any, and no other Person has the right to use such rights or to receive any royalty or similar payment in respect thereof.

10. <u>**Pension Plans, Etc.**</u> (a) Except as set forth in a separate letter to Bank of even date herewith and acknowledged by Bank in writing, neither Borrower nor any entity with which Borrower would be aggregated (a "Commonly Controlled Entity") under Section 414(b), (c), (m), or (o) of the Internal Revenue Code of 1986, as amended (the "Code"), maintains or contributes to any pension, profit sharing, or other similar plan providing for a program of deferred compensation to any employee or former employee; (b) All contributions and other payments required to be made by Borrower or any Commonly Controlled Entity to all employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which either Borrower or any Commonly Controlled Entity maintains or maintained or to which any of them contributes or has contributed (the "Employee Benefit Plans") have been made or reserves adequate for such purposes have been set aside and reflected on Borrower's Financial Statements. No Employee Benefit Plan is a plan subject to Section 412 of the Code or Section 302 of ERISA, nor is any Employee Benefit Plan a multiemployer plan as defined in Section 4001(a)(3) of ERISA. Each other Employee Benefit Plan which is an employee pension benefit plan, as defined in Section 3(2) of ERISA, has been determined to be qualified under Section 401(a) or Section 403(a) of the Code and nothing has occurred which would cause the loss of such qualification or the imposition of any tax liability or penalty under the Code or ERISA on Borrower; (c) Each Employee Benefit Plan has been and is administered in accordance with its terms and applicable law. Neither Borrower nor any Commonly Controlled Entity has breached any fiduciary duty imposed on it under ERISA; and (d) No Employee Benefit Plan which is an employee welfare benefit plan, as defined in Section 3(1) of ERISA, provides for continuing benefits or coverage for any participant (or beneficiary) after the termination of the participant's employment except as may be required under applicable law.

11. <u>**Full Disclosure**</u>. Neither the Financial Statements referred to in this <u>Schedule B</u>, nor any statement of fact made by or on behalf of Borrower in this Agreement or any of the other Loan Documents or any certificate, written statement or schedule furnished to Lender pursuant hereto,

contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact known to Borrower which has not been disclosed to Lender in writing, which could have a Material Adverse Effect.

12. **Enforceability**. This Agreement and all of the other Loan Documents executed and delivered in connection herewith are legal, valid and binding obligations of Borrower, and with respect to those Loan Documents executed and delivered by the Guarantors, of the Guarantors, and are enforceable against Borrower and the Guarantors, as the case may be, in accordance with their terms except as such enforceability may be limited by (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity.

13. **Solvency**. The fair saleable value of Borrower's assets exceeds all probable liabilities of Borrower; Borrower does not have unreasonably small capital in relation to the business in which it is or proposes to be engaged; and Borrower has not incurred, nor believes that it will incur after giving effect to the transactions contemplated by this Agreement, debts beyond its ability to pay such debts as they become due.